## Richmond

HAYES RICHLANDS METAL PRODUCTS, INC., ET AL. v. J. E. HONAKER.

June 13, 1960.

Record No. 5084.

Present, All the Justices.

The opinion states the case.

*Thomas G. Shufflebarger* and *A. G. Lively*, for the plaintiffs in error.

*Carl C. Gillespie* and *J. P. Proffitt, Jr.* (*Gillespie & Gillespie*, on brief), for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

J. E. Honaker, sometimes hereinafter referred to as plaintiff, brought this action by motion for judgment to recover of Hayes Richlands Metal Products, Inc., and its alleged agent and employee,

Charles Mundy, the sum of $50,000.00, charging that the negligence of the defendants caused a collision of plaintiff's passenger automobile with a motor truck driven by Mundy. There was a trial by jury, which resulted in a verdict in favor of the plaintiff in the sum of $6,000.00, upon which judgment was entered.

The defendants have assigned numerous grounds of error presenting the following questions: (1) Whether the plaintiff was guilty of negligence which was either the sole cause of the accident or a contributing proximate cause; (2) Whether the evidence showed that Mundy was the agent of the corporate defendant at the time of the accident; and (3) Whether the court erred in the granting and refusing of instructions.

In the view that we take of the case, the decisive question is whether plaintiff, as a matter of law, was guilty of contributory negligence which proximately caused the collision. We think the answer is in the affirmative.

The accident occurred on Highway Route 460, in a shopping area between the towns of Richlands and Cedar Bluff, Virginia, on Sunday, September 2, 1956, about 12:15 to 12:30 p.m. The day was clear and the road was dry. The highway, a two-lane road, runs straight east and west at the point of the collision. The paved portion is 31 feet in width. Five hundred and eighty-eight feet east, the road reaches the crest of a hill, and then runs slightly downgrade in a southerly direction. Motor vehicles approaching the place of the accident from the west are not visible to travelers coming from the east until the latter reach the crest of the hill. From the crest approaching vehicles are visible for a distance of approximately 2,000 feet to the west. Motor vehicles approaching from the east are not visible to travelers coming from the west until the vehicles from the east reach the crest of the hill.

On both sides of the highway, in the shopping area, there are buildings removed a slight distance from the road. On the north side a high school building is easternmost. A short distance to the west is a C. & S. Texaco Service Station. Next is a chain grocery store with a parking lot, and then further west several other business buildings. On the south side, about 200 feet west of the C. & S. Service Station, is a building, known as Lowe's Service Station, and about 25 feet west of it is a drive-in restaurant. Also on the south side and east of the C. & S. Service Station, there is a widely patronized restaurant, operated under the name of "Wimpy Jones."

Hayes Richlands Metal Products, Inc. is a corporation engaged in manufacturing and repairing trucks and other vehicles at Richlands, Virginia. Charles Mundy was employed by that Corporation in the capacity of installation foreman.

On the morning of September 2, Mundy had performed some work upon a two-ton coal truck owned by H. M. McGlothlin, the work not being a part of his usual duties. After completion of the work, he undertook to drive the truck to the C. & S. Service Station for delivery to McGlothlin. He drove the truck eastwardly along the south lane of the highway from Richlands, and when he reached the Lowe Service Station about 200 feet west of the entrance to the C. & S. Service Station, he reduced his speed to an estimated 20 miles an hour, and turned on his directional signal indicating that he would make a left turn across the westbound traffic lane of the highway. He said he looked in front and behind, saw no traffic approaching, changed to a lower gear, reduced his speed to about 10 miles an hour, and drove at a 45-degree angle across the westbound lane of the highway toward the west entrance to the C. & S. Service Station. As he was crossing that lane, he heard the skidding tires of a car "crying," looked to the east and saw plaintiff's car skidding sideways toward him from a distance of about 150 feet. The car struck his truck just as its front reached the entrance to the service station. Mundy did not see any lights on the Pontiac car, nor hear its siren sound until the collision, and did not remember very much of what thereafter occurred.

J. E. Honaker is a resident of Amonate, located on the boundary line separating McDowell county, West Virginia, and Tazewell county, Virginia. He is a part time deputy sheriff in Tazewell county and a conservator of the peace in McDowell county. About 11:30 a. m., he was in a restaurant at Amonate when Robert H. Nicholson became ill. At the request of the ill man and the latter's son, Willard Nicholson, he took the sick man in his 1955 Pontiac passenger motor vehicle to the office of a doctor. The doctor advised that the elder Nicholson be quickly taken to a hospital. With Willard seated in the right front seat and his father lying on the back seat, the plaintiff started to the hospital by way of Cedar Bluff. Honaker said that as he drove up the hill east of the point of the collision, at about 50 miles an hour, he passed three or four cars; that the lights were burning on his car, and he had turned on his siren when he started to pass the other cars; and that it was his habit

to blow his siren when he passed cars and cut it off after he had gotten ahead, but that on this occasion, he did not cut it off, because he knew that traffic was usually heavy near the Wimpy Jones Restaurant.

He increased his speed as he went up the hill from 40 to 50 miles an hour to pass other cars, and when he reached the crest, he looked west, saw that his traffic lane was clear; saw the McGlothlin truck, around 600 to 700 feet away, in the eastbound lane, at the "edge" of the white line, its "left tire tilting to the side of the road," with its directional signal light "blinking" for a left turn. He said that this signal "indicated" to him that the truck "was going to make a left turn at once." When he first saw the truck, he said he could not tell whether it was moving slowly or standing still. Later he concluded that it had stopped and he increased his speed to between 55 and 60 miles an hour. When he was about 150 feet distant from the truck it turned into the westbound lane of the highway directly in front of him. He immediately applied his brakes and cut to his right, all four wheels locked, the Pontiac skidded 100 to 150 feet, and its left front struck the left front of the truck near the entrance to the C. & S. Service Station. Asked if he increased his speed when he saw the truck in front of him with its light "blinking" for a left turn, Honaker replied, "I thought he would stay there." He also placed the point where he increased his speed as "the top of the hill." There were no vehicles between the truck and the automobile.

As a result of the collision, the truck was knocked backwards a short distance; but stopped with one wheel on the concrete entrance to the C. & S. Service Station. The right front tire of the plaintiff's car blew out as it struck the curbing and it swung around and "wrapped itself around the truck." The Pontiac then traveled a distance from 50 to 75 feet from the truck and turned completely around, with its front facing east. The Pontiac and the truck were almost completely demolished, and the plaintiff and his passenger, Robert Nicholson, received serious injuries.

Honaker said that when he reached the top of the hill, and saw the McGlothlin truck giving a signal for a lefthand turn across his lane of travel, he had his car under control and could have stopped it within a reasonable distance, estimated by him to be 100 feet. After he had increased its speed to between 55 and 60 miles, he thought he could have brought it to a stop in 150 feet or more. He does not state where his car was when he came to the conclusion that the truck was stopped in the eastbound lane. Cf. Code of Virginia, § 46.1-196,

1958 Replacement Volume, as to tables of speed, stopping distance, and time of travel within certain distances.

Four disinterested witnesses, who were near the scene of the accident, gave the following account of the collision:

W. E. Fields, deputy chief of police for the town of Cedar Bluff, was sitting on the front porch of his home, near the C. & S. Service Station, and looking in the direction of the accident. He saw Mundy's truck traveling on the highway as it started to make a left turn slowly across the road; and "glimpsed" the Pontiac car about the time of the collision. He could not estimate the speed of the Pontiac, and did not hear its siren blowing until after the collision.

Joseph Beavers, an employee at the nearby grocery store, was seated in the Wimpy Jones Restaurant, facing the highway toward the east. He said he saw the Honaker car immediately before the collision; that his attention was attracted to it because of the high speed it was making; and that it was running between 75 and 80 miles an hour. He did not see the collision, did not hear a siren blowing, and did not observe any lights on the Pontiac, but heard the noise of the collision.

Max Smith, an employee of the C. & S. Texaco Service Station, said he heard somebody say something about the car being driven by Honaker, he looked up, saw the car coming; that as it was approaching a point opposite his station, it began to slide forward; and that from his observation and experience, he thought the Pontiac, at the time he saw it, was running between 70 and 75 miles an hour. He did not see any lights on that car, nor hear its siren until the collision.

Clinton Smith, another employee of the C. & S. Service Station, said he saw the Pontiac as it was approaching the place of collision; and that, in his opinion, the car was traveling between 70 and 80 miles an hour from the time he saw it until the collision.

It is not necessary for us to consider whether the defendant, Mundy, was guilty of negligence, whether he was an agent of the corporate defendant engaged in the performance of his duties at the time of the accident, nor whether the court erred in granting and refusing instructions. We shall concern ourselves solely with the duties and responsibilities of the plaintiff, Honaker.

Code, § 46.1-189, 1958 Replacement Volume, formerly § 46-208, Code 1950, provides that:

"Irrespective of the maximum speeds herein provided, any person

who drives a vehicle upon a highway recklessly or at a speed or in a manner so as to endanger life, limb or property of any person shall be guilty of reckless driving; * * *."

Code, § 46.1-193, 1958 Replacement Volume, formerly § 46-212, Code 1950, provides that:

"No person shall drive any vehicle upon a highway of this State at a speed in excess of:

"(a) Fifty-five miles per hour if the vehicle is a passenger motor vehicle, * * *."

Code, § 46.1-190 provides that:

"A person shall be guilty of reckless driving who shall:

"(h) Exceed a reasonable speed under the circumstances and traffic conditions existing at the time regardless of any posted speed limit; * * *."

Code, § 46.1-219, formerly § 46-236, Code of 1950, provides that:

"Drivers receiving a signal from another driver shall keep their vehicle under complete control and shall be able to avoid an accident resulting from a misunderstanding of such signal."

It was the duty of Honaker both to keep his car under complete control after receiving the signal from Mundy, and to drive at a reasonable speed under the circumstances and traffic conditions existing at the time. (Code, §§ 46.1-219 and 46.1-189) and also not to exceed driving at a rate in excess of 55 miles per hour, (Code, § 46.1-193).

Viewed in the light most favorable to the plaintiff, it is clear from his testimony and that of several disinterested witnesses, that he was driving at an unlawful rate of speed immediately before the accident, and was guilty of a failure to keep his vehicle "under complete control," after he received the signal from the truck.

While Honaker says he fixed his speed near the legal limit of 55 miles an hour, after he passed the crest of the hill, there can be no doubt that he thereafter drove at an unwarranted rate and failed to exercise the care which a man of ordinary reasoning and prudence would have exercised under the conditions existing. *Noland* v. *Fowler*, 179 Va. 19, 18 S. E. 2d 251; *Rhoades* v. *Meadows*, 189 Va. 558, 54 S. E. 2d 123.

Honaker further says that driving at 50 miles an hour, he could have brought his car to a stop in about 100 feet, and that after increasing his speed, he thought he could have brought it to a stop in 150 feet or more. He does not say where he was when he de-

termined that the truck was stopped; but he does say he applied his brakes when he was about 150 feet from the truck then crossing the westbound traffic lane. He traveled more than 400 feet after seeing the truck signal before undertaking to bring his car under control.

The truck was 588 feet distant from Honaker when he first saw it in the eastbound lane signaling for a left turn, and although he said he could not then determine whether it was moving or stopped, he disregarded the warning and increased his speed to more than 55 miles per hour, in an area where he knew there were considerable business activities. He thus failed in his duty to bring his car under complete control, and avoid an accident resulting from his misunderstanding or confusion regarding such signal.

The evidence and the physical facts surrounding the impact of the automobile and the truck furnish ample proof that Honaker was guilty of contributory negligence as a matter of law, and that the collision and his resulting injuries were the natural and probable consequence of such negligence, constituting a contributing and proximate cause thereof. *Von Roy* v. *Whitescarver*, 197 Va. 384, 89 S. E. 2d 346; *Schools* v. *Walker*, 187 Va. 619, 629, 47 S. E. 2d 418; 13 Michie Jur., Negligence, §§ 20 and 21, pages 528 and 529, and cases cited.

Since the verdict of the jury upon which the judgment was based is contrary to the evidence and plainly wrong, it is our duty to reverse the judgment and to set aside the verdict. This we do, and enter final judgment for the defendants. Virginia Code, 1950, § 8-491.

*Reversed and final judgment.*